IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| BONNIE J. BARNES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 10-1233-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Bonnie Barnes seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to account for plaintiff's hand limitations and for finding that plaintiff can perform other jobs which require good use of her hands. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

I.  BACKGROUND

On July 14, 2006, plaintiff applied for disability benefits alleging that she had been disabled since July 6, 2006. Plaintiff's disability stems from myotonic dystrophy,[1] anxiety, and migraines. Plaintiff's application was denied on September 6, 2006. On May 22, 2009, a hearing was held before an Administrative Law Judge. On October 27, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 17, 2010, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1]Myotonic dystrophy is a "rare, slowly progressive, hereditary disease" characterized by increased muscular irritability and contractility, followed by atrophy of the muscles, especially those of the face and neck.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

>   Yes = not disabled.
>   No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

>   No = not disabled.
>   Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

>   Yes = disabled.
>   No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

>   No = not disabled.
>   Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

>   Yes = disabled.
>   No = not disabled.

3

Case 3:10-cv-01233-REL   Document 16   Filed 01/09/12   Page 3 of 20

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Mr. Weisman, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Records**

The record establishes that plaintiff earned the following income from 1997 to 2008, shown in actual and in indexed figures:

| Year | Actual | Indexed |
|---|---|---|
| 1997 | $ 1,598.22 | $ 2,077.38 |
| 1998 | 403.21 | 498.03 |
| 1999 | 4,767.60 | 5,577.91 |
| 2000 | 3,051.33 | 3,382.87 |
| 2001 | 2,180.95 | 2,361.58 |
| 2002 | 4,053.26 | 4,345.38 |
| 2003 | 13,451.61 | 14,076.94 |
| 2004 | 16,529.98 | 16,529.98 |
| 2005 | 10,540.95 | 10,540.95 |
| 2006 | 4,110.08 | 4,110.08 |
| 2007 | 0.00 | 0.00 |
| 2008 | 0.00 | 0.00 |

(Tr. at 113).

**Disability Report**

In a Disability Report plaintiff reported that she stopped working on April 5, 2006, because she was falling asleep all the time and having difficulty with her pregnancy (Tr. at 119). In her job as an aide she wrote, typed or handled small objects for two hours each day

4

(Tr. at 120, 126). In her job in sales/customer service she wrote, typed or handled small objects eight hours each day (Tr. at 128).

Function Report

In a Function Report dated August 14, 2006, plaintiff reported that she gets up at 6:00 a.m., cooks breakfast, spends most of the day taking care of her son, cleans sometimes, watches television or visits family, and takes several naps a day (Tr. at 136). She is able to change her son's diapers, feed him, play with him, and take care of him (Tr. at 137). When asked how her condition affects her sleep, she claimed that she sleeps all the time (Tr. at 137). She has no difficulty with dressing, bathing, taking care of her hair, shaving, feeding herself or using the toilet (Tr. at 137). She prepares meals for one to two hours each day, and she is able to do laundry (Tr. at 138). She goes out of her home three to four times a day, is able to drive, and shops each week (Tr. at 139).

B.   *SUMMARY OF MEDICAL RECORDS*

Plaintiff stopped working in April 2006, because she believed she was having difficulty with her pregnancy and was falling asleep at work (Tr. at 119). On June 5, 2006, plaintiff gave birth to a son, who was subsequently diagnosed with myotonic dystrophy (Tr. at 170, 234). Several days later, plaintiff underwent "predictive" testing for myotonic dystrophy at the request of her obstetrician, Craig Chandler, M.D., of Ob/Gyn Associates of Joplin (Tr. at 154, 165, 175). Although she was asymptomatic, testing indicated that plaintiff carried the genetic mutation associated with myotonic dystrophy and would therefore "likely be affected with or predisposed to developing [myotonic dystrophy]" (Tr. at 165, 175).

July 6, 2006, is plaintiff's alleged onset date. On July 14, 2006, she filed her application for disability benefits.

Several months later, on September 1, 2006, plaintiff saw S. Subramanian, M.D., for a consultative physical examination (Tr. at 99, 169-74). Plaintiff told Dr. Subramanian that she had just been diagnosed with myotonic dystrophy and experienced fatigue, aches, pains, and muscle spasms (Tr. at 170). She also complained of chronic anxiety, depression, and migraine headaches (Tr. at 171). Dr. Subramanian noted that plaintiff had recently given birth and was taking no medications (Tr. at 170). Upon examination, plaintiff's mental and general status, gait, and musculoskeletal system were normal (Tr. at 171). Dr. Subramanian found no arthritis or arthopathies [joint disease] of the small joints of the hands, and no evidence of limitations in sitting, standing, handling objects, hearing, speaking, traveling, lifting, carrying, or walking (Tr. at 171-72). He indicated that plaintiff's reported diagnosis of myotonic dystrophy was "not well substantiated by clinical examination" and "recommended a neurological consultation to substantiate this diagnosis" (Tr. at 171-72).

Plaintiff saw John Freitas, D.O., in October 2006, and complained of anxiety, depression, and pain in her back and legs (Tr. at 211). Plaintiff said she had a five-month-old baby and was experiencing a lot of depression (Tr. Tr. at 211). Dr. Freitas prescribed Topamax[2] and Lexapro[3] (Tr. at 211).

Plaintiff saw Dr. Freitas again in November 2006, complaining of right knee pain that interfered with her sleep (Tr. at 209-10). Dr. Freitas prescribed a lidocaine patch,[4] Medrol,[5] and Lortab [narcotic] (Tr. at 209-10).

---

[2]Anti-seizure medication.

[3]Treats depression and anxiety.

[4]A local anesthetic which causes a temporary loss of feeling in the area where the patch is applied.

[5]A corticosteroid.

6

One month later, in December 2006, plaintiff told Dr. Freitas that she was separating from her husband and having a hard time with her nerves (Tr. at 208). Dr. Freitas refilled plaintiff's Topamax and Lexapro and added Clonazepam, which treats panic attacks (Tr. at 208).

Plaintiff saw Dr. Freitas again in February 2007, March 2007, and May 2007, complaining about depression, anxiety, insomnia, knee pain, and hearing difficulties (Tr. at 205-207). Dr. Freitas noted plaintiff was doing well on medications and provided refills.

In October 2007, plaintiff saw Louise Hansen, R.N., C.S.F.N.P., at the Ozark Center, complaining of anxiety and bipolar disorder (Tr. at 180). Plaintiff said that she had not slept for five days, was angry, irritable, easily distracted, and impulsive (Tr. at 180). Upon examination, Ms. Hansen found that plaintiff was alert and oriented with linear, goal-directed speech, euthymic mood,[6] and no evidence of hypomania[7] or cognitive dysfunction (Tr. at 181). Ms. Hansen diagnosed bipolar disorder[8] by history with depressive symptoms. She prescribed Lamictal [treats seizures] and Seroquel XR [treats major depressive disorder and bipolar disorder] and recommended follow up in two weeks (Tr. at 182).

When plaintiff next saw Dr. Freitas in December 2007, she complained of muscle spasms, anxiety, depression, and a lump in her breast (Tr. at 204). Dr. Freitas prescribed Wellbutrin [treats depression] and Valium [treats anxiety and muscle spasms] (Tr. at 204).

In April 2008, plaintiff saw a physician at Complete Quick Care,[9] claiming that she had a bacterial infection and needed refills of mediation (Tr. at 203). Plaintiff was diagnosed with

---

[6]The absence of depressed or elevated mood, i.e., mood in the normal range.

[7]A mild form of mania, marked by elation and hyperactivity.

[8]A mental disorder marked by alternating periods of elation and depression.

[9]It is difficult to discern the specific names and credentials of individuals who signed the "Physician's signature" blocks on Complete Quick Care treatment records (Tr. 200-03).

7

bacterial vaginosis, depression, and panic attacks, and was given Valium and Wellbutrin (Tr. at 203).

Plaintiff saw Waqar Waheed, M.D., a neurologist at St. John's Medical Group, in June 2008, for a neurological consultation and to establish care for her myotonic dystrophy (Tr. at 183). Plaintiff complained of weakness in her hands, difficulty opening jars, and cramping (Tr. at 183).

> The patient had recent DNA testing done 6/8/06 which was consistent with myotonic muscular dystrophy Type I.
>
> The patient has history suggestive of weakness involving distal hand muscles. She has difficulty opening jars and complains of cramps. She also complains of exertional myalgias. She complains of fatigue. She also gives history suggestive of obstructive sleep apnea. . . She also gets frequent headaches. She has history of underlying bipolar disorder. . . . She also complains of intermittent lower extremity numbness for the last six months. She complains of mid-thoracic pain. . . .

Plaintiff was taking Wellbutrin and Valium. She was smoking ten cigarettes per day and had been smoking for a few years. Upon examination, Dr. Waheed found that plaintiff had some weakness in the distal hand muscles and deltoid but otherwise her strength was normal (Tr. at 184). She was able to walk unassisted and showed no evidence of scoliosis, although X-rays showed a "very slight" scoliosis[10] of the upper thoracic spine with otherwise normal alignment (Tr. at 184, 186). An echocardiogram (EKG) was normal (Tr. at 187). Dr. Waheed recommended screening plaintiff for comorbidities[11] associated with myotonic dystrophy and suggested that she participate in clinical research trials (Tr. at 185).

In August 2008 plaintiff was seen at Complete Quick Care complaining of anxiety, and she asked for a refill of Valium (Tr. at 202). She was assessed with "bipolar disorder - stable" and was told to continue on her medication.

---

[10]Curvature of the spine.

[11]The presence of additional conditions with the initially diagnosed illness.

8

Plaintiff went to the Freeman Hospital emergency room on September 9, 2008, complaining of low back pain (Tr. at 189, 196-197). Joaquin Guzon, M.D., diagnosed acute lumbar strain, low back pain, and a mild urinary tract infection (Tr. at 189-191). He gave plaintiff Valium. Three weeks later, plaintiff went to Complete Quick Care complaining of anxiety and bipolar disorder -- and she requested more Valium (Tr. at 201). The doctor refilled her Valium and Wellbutrin.

Plaintiff returned to the Freeman emergency room on November 30, 2008, complaining of non-severe back and knee pain (Tr. at 212-213, 215-216). James Compton, D.O., observed that plaintiff had full range of motion in both knees and negative straight-leg raising tests (Tr. at 214). Her psychological exam was normal. Dr. Compton diagnosed acute myofascial strain and prescribed Vicodin [narcotic], Flexeril [muscle relaxer], and Aleve [non-steroidal anti-inflammatory] (Tr. at 214, 219).

On December 10, 2008, plaintiff returned to Complete Quick Care reporting that her puppy had eaten all her Valium; but she did not think that Valium was helping, and she wanted to try a different medication (Tr. at 200). The examining physician assessed anxiety disorder and prescribed Buspar (Tr. at 200).

Plaintiff was back at the Freeman emergency room on January 1, 2009, complaining of upper back pain (Tr. at 221, 223, 225). Plaintiff reported a history of chronic back pain and bipolar disorder with anxiety. Troy Michelberger, D.O., administered pain medication at the hospital and gave plaintiff Flexeril [muscle relaxer] and Buspar [treats anxiety] to take at home (Tr. at 222, 227).

On May 11, 2009, plaintiff told Ian Kling, M.D., a psychiatrist at MHNet Behavioral Health, that her young son was disabled due to myotonic dystrophy, her obstetrician had diagnosed her with myotonic dystrophy, and her "goal" was "to obtain disability" as well (Tr.

9

at 252). Plaintiff said she developed anxiety in 2002, had been told that she was bipolar by three doctors, and was taking Valium (Tr. at 251, 253). Dr. Kling observed that plaintiff was well-manicured, had high strung features, and her cognition was intact (Tr. at 252). He diagnosed anxiety disorder, noted that plaintiff had the "stress of [taking care of a] disabled child," and he added Xanax [treats anxiety and panic disorders] to plaintiff's prescriptions (Tr. at 253).

The record contains an MHNet assessment form dated May 15, 2009, signed only by plaintiff (Tr. at 248). The "clinical information based on most recent assessment" indicated that plaintiff had no limitations in her ability to care for her self, mild limitations in her ability to form and keep positive relationships, moderate ability to cope with unexpected change, and severe limitations in her ability to function at work and school. Nothing on the form indicates who completed it; however, plaintiff's signature is the only one on the form and the information in the form is consistent with Dr. Kling's statement about plaintiff's self-assessed limitations, suggesting that plaintiff likely completed the assessment herself.

Plaintiff saw Dr. Kling again on May 18, 2009 (Tr. at 250). Treatment notes are unclear but appear to discuss plaintiff's relationship with a boyfriend of seven months (Tr. at 250).

On May 20, 2009, Dr. Kling submitted an opinion letter to plaintiff's counsel in which he stated that he had seen plaintiff twice in the past month and that she had major depression with significant symptoms including anxiety, panic attacks, and fatigue (Tr. at 231, 246). Dr. Kling noted that plaintiff also had myotonic dystrophy, which included neurological symptoms such as migraine headaches and musculoskeletal back limitations (Tr. at 231). He indicated that plaintiff had self-identified a severe inability to function in a work, school, or structured setting, and she appeared to be sincere (Tr. at 231).

10

When Dr. Kling saw plaintiff next on July 3, 2009, he observed that she was appropriately attired, socially appropriate, respectful, anxious, and attentive (Tr. at 249). Plaintiff had a chaotic living situation and financial problems and was seeking disability (Tr. at 249). Dr. Kling diagnosed anxiety and stress and refilled plaintiff's Xanax prescription (Tr. at 249).

On September 2, 2009, Kevin Whisman, Psy.D., conducted a consultative mental status evaluation of plaintiff, which included an interview, review of plaintiff's treatment records, and a mental status examination (Tr. at 256). Plaintiff told Dr. Whisman she was unable to work because she had myotonic dystrophy, no short-term memory, and was unable to concentrate; she said she spent most of the day worrying about her son (Tr. at 257). She had been married twice and participated in five cohabitating relationships. At that time she was living with her mother but had a boy friend. Plaintiff's chief complaints were about her physical condition, not her mental impairments (Tr. at 259). She indicated that she had been fired from a lot of jobs for not getting there on time or for falling asleep. She said others would probably describe her work performance as poor. "The client expressed interest in seeking employment, yet stated 'it is not something I can do every day.'"

When asked to describe her present health, plaintiff said, "Horrible. [I have] muscle weakness from head to toe. I have headaches. My knees are killing me right now. My ankles hurt. I can't walk four blocks without breathing heavily. My hips hurt all the time, my head hurts all the time. I have chronic pain 24/7. It is horrible." Plaintiff reported using marijuana "if not every day then every other day" up until about a year earlier.

Dr. Whisman noted that personality testing results did not appear to be valid, attributing this to plaintiff's effort to portray herself negatively, random responses, or a "plea for help." (Tr. at 258). Plaintiff "claimed to experience symptoms most consistent with an

11

affective disorder. Current features included a depressed mood, anhedonia,[12] sleep disturbance, lethargy, and poor self-concept. The client was observed to become tearful during one portion of the evaluation. Results of objective testing were unable to substantiate these allegations. Ms. Barnes'[s] chief complaint was related to her physical condition." (Tr. at 259).

He diagnosed major depressive disorder, mild, rule out somatoform disorder,[13] and assigned a global assessment of functioning score of 66[14] (Tr. at 259). Following the examination and file review, Dr. Whisman made the following findings:

> 1. What is the client's MAXIMUM remaining ability to understand and remember instructions?
>
> Ms. Barnes arrived on time for the appointment and demonstrated understanding of the purpose for the evaluation. She demonstrated an ability to relate with the examiner and answered questions appropriately. The mental status did not reflect any difficulties with memory or comprehension. She successfully followed a simple, three-step command. The client's maximum remaining ability to understand and remember instructions would likely be in most all tasks.
>
> 2. What is the client's MAXIMUM remaining ability to sustain concentration and persistence in tasks?
>
> Ms. Barnes performed relatively well on tasks of the mental status exam. She was successful at responding to examiner prompts and her speech was not derailed or circumstantial. The client did not appear to be distracted by internal or external events. Based upon the clinical presentation, her maximum remaining ability to sustain concentration and persistence is believed to be adequate in most all tasks.
>
> 3. What is the client's MAXIMUM remaining ability to interact socially and adapt to her environment?

---

[12]Loss of capacity to experience pleasure.

[13]Mental illness that can cause physical pain and other symptoms without physical explanation; can lead people to seek out diagnoses and imagine they have diseases they do not have.

[14]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

> The client's current emotional functioning may impede her effectiveness at interacting socially on a consistent basis. However, the mannerisms observed throughout evaluation were appropriate and within normal limits. She appeared to relate well with the examiner and office personnel. It is suspected the client's maximum remaining ability to interact socially and adapt to her environment would be within a moderately restricted social environment.

(Tr. at 259).

Hish Majzoub, M.D., of Joplin Neurosurgical Associates, Inc., conducted a consultative neurological examination of plaintiff on September 22, 2009 (Tr. at 264). Plaintiff reported that she had been diagnosed with myotonic dystrophy in 2006 and had weakness in her hands, legs, back, and arms since age 12. The weakness is worse in her hands. She claimed she could not squeeze and relax, she said she could only walk four blocks before needing to sit down, and she said she has difficulty using her hands to do things like writing long letters.

> She states her arms and legs are weak all over. She gets tired all the time. She has not had any numbness or tingling. She has pain in her upper back and intra-scapular area. Her pain is present all the [time]. She stated she injured her back three days ago by lifting a small object.
>
> The patient stated she has not taken any medications for her myotonic muscular dystrophy. . . . She has had bipolar disorder since age 22 and depression since age 15. She has occasional sleep apnea and difficulty sleeping. . . . She tends to sleep during the daytime. She does have a mild sleep apnea. She has difficulty concentrating.

(Tr. at 264-265).

Dr. Majzoub performed a physical exam and found that plaintiff was well dressed and clean, her hair was well combed, she was well mannered. Her vital signs were normal. She had "difficulty relaxing her grips after gripping." Her thumb contracted but did not relax quickly. She had "slight difficulty with her upper arms" as well as slight weakness in her upper arms. Plaintiff had no leg weakness and had no difficulty walking. Plaintiff could squat and rise without difficulty, she could get up from the sitting and lying down position with "slight difficulty," and had to use her upper arms to get up from a supine position. Plaintiff could not raise her eyebrows well but had no facial weakness. Plaintiff had no difficulty with

13

her zipper but had slight difficulty with buttons. She had full range of motion in her arms, back and neck.

## C.    SUMMARY OF TESTIMONY

During the May 22, 2009, hearing, plaintiff testified; and Mr. Weisman, a vocational expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

At the time of the hearing plaintiff was 28 years of age and is currently 31 (Tr. at 27). She graduated from high school and then went to cosmetology school for one year (Tr. at 27). She finished that training but did not pass the state board (Tr. at 27).

Plaintiff worked for three months in the kitchen of a mental institution (Tr. at 27). She worked as a car hop and as a telemarketer three different times (Tr. at 28-29). Plaintiff got laid off one time, another time she resigned because she kept falling asleep at her desk and was getting in trouble for that (Tr. at 30-31). Plaintiff worked as a sound technician at a television station (Tr. at 48). She worked for three years as a CNA taking care of clients (Tr. at 55).

Plaintiff was diagnosed with myotonic muscular dystrophy when her son was born (Tr. at 33). This makes her fall asleep and on bad days she cannot concentrate (Tr. at 34). Plaintiff has muscle cramps all over her body, muscle spasms in her back, her hands will clinch up where she has to force them open, and she cannot walk long distances (Tr. at 34). She cannot pick up a huge amount of weight, and it is hard to do household chores because her pain is worse with exertion (Tr. at 34). Plaintiff has migraine headaches at least once a week for which she takes over-the-counter Excedrin and lies in a dark room (Tr. at 35-36). She has had these migraines since she was 14 (Tr. at 35). She has been admitted to the hospital for migraines in the past (Tr. at 35). A migraine will last all day (Tr. at 36).

Plaintiff experiences anxiety and panic attacks (Tr. at 37). Her panic attacks occur on average once a day and last three to four hours (Tr. at 37). She cries uncontrollably and has memory problems (Tr. at 37). She is irritable and angers easily (Tr. at 37). Plaintiff was recently prescribed Xanax and Valium (Tr. at 38).

In October 2007 plaintiff was experiencing cycles where she would get a big high, make stupid decisions, and get angry very easily. Then she would have a cycle a few days later during which she would sleep all day and felt depressed (Tr. at 40).

Plaintiff typically spends the day with her son who was about three at the time of the hearing and suffers from muscular dystrophy (Tr. at 42). On good days, she goes out and does things (Tr. at 42). Plaintiff's son requires a lot of care, but she gets help from her mother (Tr. at 43). Plaintiff and her son live with plaintiff's mother and a 23-year-old nephew (Tr. at 43, 46). Plaintiff's mother works nights (Tr. at 46). During the day, plaintiff stays up for about four hours and then sleeps for two or three hours (Tr. at 44).

Plaintiff has a driver's license and drives occasionally (Tr. at 44). She can drive halfway from Joplin to Kansas City when she has to take her son to the doctor (Tr. at 44-45). On plaintiff's good days, she can stay awake for eight hours and do housework and shopping (Tr. at 45). Plaintiff has about five bad days and two good days per week (Tr. at 46).

Plaintiff resigned from her last job in the late stages of her pregnancy (Tr. at 47). Her alleged onset date was a month after her son was born (Tr. at 47).

2. Vocational expert testimony.

Vocational expert Mr. Weisman testified at the request of the Administrative Law Judge. The first hypothetical involved a person who is limited to sedentary work, simple tasks with routine supervision, only superficial contact with coworkers and supervisors, and no contact with the general public (Tr. at 57). The vocational expert testified that such a person could

15

work as a clerical mailer with 4,200 such jobs in the region and 92,500 in the nation (Tr. at 58). The person could also work as a semiconductor assembler, with 2,500 such jobs in the region and 80,000 in the nation (Tr. at 58).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Glenn Neel entered his opinion on October 27, 2009. He found that plaintiff meets the insured status requirements through June 30, 2010 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 13).

Step two. Plaintiff suffers from myotonic muscular dystrophy, major depressive disorder, and somatoform disorder - severe impairments (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13-14).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work except that she is limited to only simple tasks with routine supervision, superficial contact with coworkers and supervisors, and no contact with the general public (Tr. at 14). With this residual functional capacity, plaintiff cannot perform her past relevant work (Tr. at 20).

Step five. Plaintiff can work as a clerical mailer or a semi-conductor assembler, both jobs available in significant numbers in the economy (Tr. at 20). Therefore, plaintiff is not disabled (Tr. at 21).

## VI. *PLAINTIFF'S HAND LIMITATIONS*

Plaintiff argues that the ALJ failed to account for plaintiff's significant limitations in her ability to use her hands, such as her difficulty relaxing her hands after making a fist and her alleged inability to pick up anything "with a huge amount of weight on it." After carefully considering of all of the evidence of record and evaluating the credibility of plaintiff's

16

subjective claims, the ALJ incorporated into plaintiff's residual functional capacity all of the limitations he found credible and determined that plaintiff could perform sedentary work except that she is limited only to simple tasks with routine supervision, superficial contact with coworkers and supervisors, and no contact with the general public.

An ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). The Eighth Circuit has noted that the evidence relevant to a residual functional capacity determination includes the medical records, observations of treating physicians and others, and an individual's own description of his or her limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d at 779). In this case, substantial evidence supports the ALJ's findings that plaintiff's limitations were adequately considered.

In assessing plaintiff's residual functional capacity, the ALJ gave "great weight" to the opinions of Drs. Subramanian and Majzoub, both of whom examined plaintiff. Dr. Subramanian found that plaintiff had no difficulty handling objects, sitting, standing, hearing, speaking, traveling, lifting, carrying or walking. Recognizing that plaintiff had not received ongoing care from a neurologist and giving plaintiff the benefit of the doubt, the ALJ arranged for a consultative examination by Dr. Majzoub, a neurologist.

Dr. Majzoub observed that plaintiff had difficulty relaxing her hands after gripping, and he felt that plaintiff had "moderate weakness in her arms and legs, mostly in the arm and hand function." However, upon examination, he observed only minimal clumsiness on rapid rhythmic movements and noted that plaintiff had no difficulty with a zipper and only slight difficulty using her hands, maneuvering small objects, and with buttons. He rated plaintiff's upper extremity strength and grip strength as 4/5 and noted that she was able to complete

17

simple tasks without difficulty. Dr. Majzoub's examination report does not support plaintiff's claims of hand-related limitations greater than those accounted for in the ALJ's residual functional capacity assessment.

In addition to the medical opinions discussed above, the record establishes that plaintiff's first complaint of hand problems was in June 2008 -- two years after her alleged onset date. At that time she was seen by Dr. Waheed who found that her hand strength was normal. Plaintiff never complained to another treating physician about hand difficulties. In fact, her previous jobs required her to write, type, or handle small objects from two to eight hours per day. She was able to change her son's diapers, feed him, and take care of herself and her son. Plaintiff's lack of medical treatment or even comments to doctors about any difficulty with her hands coupled with her daily activities corroborate the medical opinions that plaintiff's use of her hands is not limited any more than that accounted for by the ALJ in his residual functional capacity assessment.

The ALJ accorded great weight to the opinions of Drs. Subramanian and Majzoub and, in light of their findings and other credible evidence of record, limited plaintiff to sedentary work. By limiting plaintiff to lifting and carrying no more than ten pounds at a time, the ALJ acknowledged and accounted for plaintiff's credible limitations. See 20 C.F.R. §§ 404.1567(a) and 416.967(a) (defining sedentary work). See also Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) ("[A]ny loss of Zeiler's grip strength is accommodated by the ALJ's decision that she is limited to light work"). In this case, the ALJ carefully considered plaintiff's claimed symptoms and all of the evidence of record in properly assessing plaintiff's residual functional capacity.

Plaintiff's argument that the hypothetical question was deficient because the ALJ did not present plaintiff's limitations "with precision" is also without merit. Plaintiff claims that the hypothetical was defective because the limitation to "simple" tasks did not adequately communicate plaintiff's mental limitations to the vocational expert. After determining that plaintiff's subjective complaints of disabling symptoms were not credible and considering all of the evidence of record, the ALJ incorporated into plaintiff's residual functional capacity those impairments and restrictions found credible, and posed a properly-formulated hypothetical question to the vocational expert, who testified that such an individual could perform work existing in significant numbers in the national economy. "The hypothetical question need include only those impairments and limitations found credible by the ALJ." Gragg v. Apfel, 615 F.3d 932, 940 (8th Cir. 2010). The hypothetical question in this case was proper, as it need not include limitations that have been properly discredited. Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

The ALJ also properly accounted for plaintiff's mental impairments by limiting her to simple tasks with routine supervision, superficial contact with coworkers and supervisors, and no contact with the general public. Contrary to plaintiff's argument, the hypothetical "need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006) (internal quotation omitted). The vocational expert did not express any confusion about or difficulties in understanding the ALJ's guidance. Moreover, the Eighth Circuit has repeatedly recognized the validity of ALJ decisions based on limiting claimants to "simple" work or tasks. See Martise v. Astrue, 641 F.3d 909, 920 (8th Cir. 2011) (affirming a decision that included a limitation to "simple instructions and non-detailed tasks"); Davidson v. Astrue, 578 F.3d 838 (8th Cir. 2009) (affirming a decision based

19

on a limitation to "simple work with few variables" and supervision that was "simple, direct, and concrete"); Cox v. Astrue, 495 F.3d 614 (8th Cir. 2007) (affirming a decision that included a limitation to "simple, routine, repetitive tasks").

Contrary to plaintiff's argument, the hypothetical question posed to the vocational expert in this case was properly formulated and sufficiently precise. It included those impairments the ALJ found credible and excluded those he discredited for legally sufficient reasons. The vocational expert's testimony that plaintiff could perform work existing in substantial numbers in the national economy constitutes substantial evidence in support of the ALJ's determination. Miller v. Shalala, 8 F.3d 611, 613-14 (8th Cir. 1993).

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 9, 2012